

FILED

2019 JAN 18 P 3: 51

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO.: 19-697                                                              DIV.: C-10

### HARRY F. MARSH

### VERSUS

ANCO INSULATIONS, INC., A.W. CHESTERTON COMPANY, BAYER
CROPSCIENCE, INC. (as successor to Rhone Poulenc AG Company, f/k/a Amchem
Products, Inc., f/k/a Benjamin Foster Company), BEXAR CANYON MANAGEMENT,
INC. (f/k/a H.B. Zachry Company), BP PRODUCTION NORTH AMERICA, INC.
(individually and as successor in interest to Pan American Petroleum and Transport
Company), CBS CORPORATION (a Delaware corporation, f/k/a Viacom, Inc., successor
by merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric
Corporation), CERTAIN-TEED CORPORATION (f/k/a Certain-Teed Products
Corporation), CHARLES JOHNSON, CHAS. KURZ & CO., INC., CHEVRON U.S.A.
INC. (f/k/a Gulf Oil Corporation), CHIQUITA BRANDS INTERNATIONAL, INC.
(individually and as successor in interest to United Fruit Company), CRANE CO.,
CRESCENT MATERIALS SERVICE, INC., CSR, LIMITED, FARRELL LINES
(individually and as successor in interest to American Export Lines, Inc.), FMC
CORPORATION (individually and as successor in interest to Crosby Valve, Inc. and
Peerless Pump Corporation), FOSTER WHEELER CORPORATION, GENERAL
ELECTRIC COMPANY, GOULDS PUMPS, LLC, GREFCO, INC., HOPEMAN
BROTHERS, INC., HUNTINGTON INGALLS INCORPORATED (f/k/a Northrop
Grumman Shipbuilding, Inc.), IDEX CORPORATION (f/k/a Viking Pump, Inc.),
INGERSOLL-RAND COMPANY, INTERNATIONAL PAPER COMPANY (f/k/a
Champion International Corporation, f/k/a U.S. Plywood Corporation), ISBRANDTSEN
COMPANY, INC., JOHN CRANE, INC., LGS TECHNOLOGIES (f/k/a Longhorn Gasket
and Supply), LIBERTY MUTUAL GROUP, INC. (as the insurer of Wayne Manufacturing
Co.), MARYLAND CASUALTY COMPANY (as the insurer of Marquette Insulations,
Inc.), METROPOLITAN LIFE INSURANCE COMPANY, NATIONAL BULK
CARRIERS, INC., OWENS-ILLINOIS, INC., TAYLOR-SEIDENBACH, INC., TEXACO,
INC. (f/k/a The Texas Co.), THE McCARTY CORPORATION, TRIPLEX, INC., UNION
CARBIDE CORPORATION, WARREN PUMPS, LLC, AND WEIR VALVES &
CONTROLS USA, INC. (f/k/a Atwood & Morrill Co., Inc.)

FILED:_____          _____
                                                                DEPUTY CLERK

### ORIGINAL PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes petitioner, Harry F. Marsh,

who files this Original Petition for Damages and respectfully represents:

1.

Petitioner, Harry F. Marsh., is a person of the full age of majority, and is a domiciliary of

Bexar County, Texas.

## ASBESTOS DEFENDANTS

2.

The following are manufacturers, distributors, and/or users of asbestos products to which Plaintiff was exposed and by which Plaintiff was injured. These defendants are hereinafter at times collectively referred to as "Asbestos Defendants":

**ANCO INSULATIONS, INC.**, a Louisiana corporation with its registered office in East Baton Rouge Parish and with its registered agent for service of process being Brent J. Bourgeois, Roedel, Parsons, Koch, Blache, Balhoff, & McCollister at 8440 Jefferson Highway, Suite 301, Baton Rouge, Louisiana 70809-7654.

**A.W. CHESTERTON COMPANY**, a foreign corporation licensed to do business in Louisiana, but organized, created, and existing under and by virtue of the laws of the State of Massachusetts, with its principal business establishment in Louisiana in Caddo Parish, and whose registered agent for service of process is C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**BAYER CROPSCIENCE, INC. (as successor to Rhone-Poulenc AG Company, f/k/a Amchem Products, Inc., f/k/a Benjamin Foster Company)**, a foreign corporation organized, created, and existing under and by virtue of the laws of the State of New York, with its registered agent for service of process being Corporation Service Company, 80 State Street, Albany, New York 12207-2543.

**BEXAR CANYON MANAGEMENT, INC. (f/k/a H.B. Zachry Company)**, a foreign corporation organized, created, and existing under and by virtue of the laws of the State of Delaware, but licensed to do and doing business in Louisiana, with its primary place of business in Louisiana in East Baton Rouge Parish, and whose registered agent for service of process is C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**CBS CORPORATION (a Delaware corporation, f/k/a Viacom, Inc., successor by merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation)**, a foreign corporation not licensed to do business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of Delaware, which may be served through the Louisiana Long-Arm Statute at Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

**CERTAIN-TEED CORPORATION (f/k/a Certain-Teed Products Corporation)**, a foreign corporation organized, created and existing under and by virtue of the laws of the State of Maryland with its principal place of business in Maryland. Certain-Teed Corporation is also sued by virtue of its acquisition of Brand Insulations, Inc., during Certain-Teed's merger with Gustin-Beacon Manufacturing Company in 1966; prior to transfer of stock of Brand Insulations into a joint venture known as Certain-Teed Saint Gobain, whose principal place of business is Swedesford & Old School Roads, Valley Forge, Pennsylvania 19481. Certain-Teed Corporation's registered agent for service of process is C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**CHARLES JOHNSON**, a person of the full age of majority and domiciled in Waynesboro, Virginia and whose address is 436 Raleigh Court, Waynesboro, Virginia 22980. Mr. Johnson was responsible for the health and safety of employees at Hopeman Brothers Incorporated.

**CRANE CO.,** a foreign corporation organized, created, and existing under and by virtue of the laws of the State of Delaware which may be served through the Louisiana Long-Arm Statute at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

**CRESCENT MATERIALS SERVICE, INC.,** a Louisiana corporation with its registered office in Jefferson Parish and with its registered agent for service of process being Elizabeth F. Pretus Ebarb, 10016 Idlewood Place, River Ridge, Louisiana 70123.

**CSR, LIMITED ("hereinafter referred to as CSR"),** an Australian corporation authorized to do and/or doing business in the State of Louisiana that was engaged in the business of mining, manufacturing, selling, distributing and/or supplying asbestos, which was expected to and did reach, including but not limited to, Louisiana and the New Orleans area. CSR may be served through its agent for service in the State of Louisiana, namely: Frank Accardo, Esq., 1100 Poydras Street, 3200 Energy Centre, New Orleans, Louisiana 70163-1132; and counsel of record in California may also be served pursuant to the Louisiana Long Arm Statute, to wit: Michael Futterman, Esq., Futterman & Dupree, LLP, 160 Sansome Street, 17th Floor, San Francisco, California 94104. And may also be served pursuant to the Louisiana Long Arm Statute, to-wit: CSR Limited, 9 Help Street, Chatswood, New South Whales, Australia 2067. This defendant is being sued as an Asbestos Miner/Manufacturer/Seller/Supplier/Distributer Defendant.

**FMC CORPORATION (individually and as successor in interest to Crosby Valve, Inc. and Peerless Pump Corporation),** a foreign corporation organized, created, and existing under and by virtue of the laws of the State of Pennsylvania, with its principal place of business at 1735 Market Street, Philadelphia, Pennsylvania 19103, and with its registered agent for service of process being C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**FOSTER WHEELER CORPORATION,** a foreign corporation organized, created, and existing under and by virtue of the laws of the State of Delaware which may be served through the Louisiana Long-Arm Statute at United States Corporation Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

**GENERAL ELECTRIC COMPANY,** a foreign corporation organized, created and existing under and by virtue of the laws of the State of Connecticut, with its principal business establishment at 3135 Easton Turnpike, Fairfield, Connecticut 06828, and with its registered agent for service of process being C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**GOULDS PUMPS, LLC,** a foreign corporation licensed to do and doing business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of New York, with its principal business establishment in Louisiana in East Baton Rouge Parish and its registered agent for service of process being C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**GREFCO, INC.,** a foreign corporation licensed to do and doing business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of California, with its principal business establishment in Louisiana in East Baton Rouge Parish, and whose registered agent for service of process is Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, Louisiana 70802.

**HOPEMAN BROTHERS, INC.,** a foreign corporation not currently licensed to do business in the State of Louisiana, but organized, created and existing under and by virtue of the laws of the State of Delaware and over which this Honorable Court has personal jurisdiction pursuant to the Louisiana Long-Arm Statute, and which can be served thereunder at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

**HUNTINGTON INGALLS INCORPORATED (f/k/a Northrop Grumman Shipbuilding, Inc.),** a foreign corporation organized, created, and existing under and by virtue of the laws of the State of Virginia, with its principal place of business at 4101 Washington Avenue, Newport News, Virginia 23607, and whose registered agent for service of process is C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**IDEX CORPORATION (f/k/a Viking Pump, Inc.),** a foreign corporation not currently licensed to do business in the State of Louisiana, but organized, created and existing under and by virtue of the laws of the State of Illinois and over which this Honorable Court has personal jurisdiction pursuant to the Louisiana Long-Arm Statute, and which can be served thereunder at C.T. Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

**INGERSOLL-RAND COMPANY,** a foreign corporation licensed to do business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of New Jersey, with its principal business establishment in Louisiana in Orleans Parish and whose registered agent for service of process is Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, Louisiana 70802.

**INTERNATIONAL PAPER COMPANY (f/k/a Champion International Corporation, f/k/a U.S. Plywood Corporation),** a foreign corporation licensed to do business in Louisiana, but organized, created, and existing under and by virtue of the laws of the State of Tennessee, with its principal business establishment in Louisiana in Morehouse Parish, and whose registered agent for service of process is C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**JOHN CRANE, INC.,** a foreign corporation licensed to do and doing business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of Illinois, with its principal business establishment in Louisiana in East Baton Rouge Parish, and whose registered agent for service of process is C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**LGS TECHNOLOGIES (f/k/a Longhorn Gasket and Supply),** individually and as successor-in-interest to Longhorn Gasket and Supply Company, may be served with process at 2950 W. Wintergreen, Lancaster, Texas 75134.

**LIBERTY MUTUAL GROUP, INC. (as the insurer of Wayne Manufacturing Co.),** a foreign insurance company which can be served through the Louisiana Secretary of State, 3851 Essen Lane, Baton Rouge, Louisiana 70809.

**MARYLAND CASUALTY COMPANY (as the insurer of Marquette Insulations, Inc.),** a foreign insurance company which can be served through the Louisiana Secretary of State, 3851 Essen Lane, Baton Rouge, Louisiana 70809.

**METROPOLITAN LIFE INSURANCE COMPANY,** a foreign insurance company which can be served through the Louisiana Secretary of State, 3851 Essen Lane, Baton Rouge, Louisiana 70809.

**OWENS-ILLINOIS, INC.,** a foreign corporation not currently licensed to do business in the State of Louisiana, but organized, created and existing under and by virtue of the laws of the State of Delaware, and which may be served under the Louisiana Long-Arm Statute at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

**TAYLOR-SEIDENBACH, INC.,** a Louisiana corporation with its registered office in Orleans Parish, and whose agent for service of process is Robert I. Shepard, 731 South Scott Street, New Orleans, Louisiana 70119.

**THE McCARTY CORPORATION**, a Louisiana corporation with its registered office in East Baton Rouge Parish, and whose agent for service of process is Paul Spaht, 4232 Bluebonnet Blvd., Baton Rouge, Louisiana 70809.

**TRIPLEX, INC.**, a foreign corporation organized, created, and existing under and by virtue of the laws of the State of Texas, which may be served under the Louisiana Long-Arm Statute c/o Denise Rodriquez, 1122 Kress, Houston, Texas 77020.

**UNION CARBIDE CORPORATION**, a foreign corporation organized, created, and existing under and by virtue of the laws of the State of New York, and whose agent for service of process is CT Corporation System, 3867 Plaza Tower Dr., Baton Rouge, Louisiana 70816.

**WARREN PUMPS, LLC**, a foreign corporation not currently licensed to do business in Louisiana, but organized, created, and existing under and by virtue of the laws of the State of Delaware, which may be served under the Louisiana Long-Arm Statute at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

**WEIR VALVES & CONTROLS USA, INC. (f/k/a Atwood & Morrill Co., Inc.)**, a foreign corporation not currently licensed to be business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of Massachusetts, which may be served under the Louisiana Long-Arm Statute at CT Corporation System, 155 Federal Street, Suite 700, Boston, Massachusetts 02110.

<u>JONES ACT DEFENDANTS</u>

3.

The following are defendants are subject to the Jones Act as Plaintiff worked as a Jones Act seaman under the Jones Act, 46 U.S.C. Sections 30104 et seq (formally 46 U.S.C. Section 688). These defendants are hereinafter at times collectively referred to as "Jones Act Defendants":

**BP PRODUCTS NORTH AMERICA, INC. (individually and as successor in interest to Pan American Petroleum and Transport Company)**, a foreign corporation not currently licensed to conduct business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of Maryland, which may be served under the Louisiana Long-Arm Statute through its registered agent, CT Corporation System, 1999 Bryan Street Suite 900, Dallas, Texas 75201.

**CHAS. KURZ & CO., INC.**, a foreign corporation not currently licensed to conduct business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of Delaware, which may be served under the Louisiana Long-Arm Statute at One Bala Plaza East, Suite 600, Bala Cynwyd, Pennsylvania 19004-1496.

**CHEVRON U.S.A. INC. (f/k/a Gulf Oil Corporation)**, a foreign corporation organized, created and existing under and by virtue of the laws of the State of Pennsylvania, and whose agent for service of process is The Prentice-Hall Corporation System, Inc., 501 Louisiana Ave., Baton Rouge, Louisiana 70802.

**CHIQUITA BRANDS INTERNATIONAL, INC. (individually and as successor in interest to United Fruit Company)**, a foreign corporation organized, created and existing under and by virtue of the laws of the State of New Jersey, and whose agent for service of process is CT Corporation System, 3867 Plaza Tower Dr., Baton Rouge, Louisiana 70816.

**FARRELL LINES (individually and as successor in interest to American Export Lines, Inc.),** a foreign corporation not currently licensed to conduct business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of Delaware, which may be served under the Louisiana Long-Arm Statute at 2510 Walmer Avenue, Suite C, Norfolk, Virginia 23513-2601.

**ISBRANDTSEN COMPANY, INC.,** a foreign corporation not currently licensed to conduct business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of New York, which may be served under the Louisiana Long-Arm Statute at 26 Broadway, New York, New York 10004.

**NATIONAL BULK CARRIERS, INC.,** a foreign corporation not currently licensed to conduct business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of New Jersey, which may be served under the Louisiana Long-Arm Statute at c/o Eight Points Asset Management, 445 Park Avenue, Suite 1503, New York, New York 10022.

**TEXACO, INC. (f/k/a The Texas Co.),** a foreign corporation not currently licensed to conduct business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of Delaware, which may be served under the Louisiana Long-Arm Statute at 6001 Bollinger Canyon Road, San Ramon, California 94583-2324.

## SUBJECT MATTER JURISDICTION AND GOVERNING LAW

4.

This Court possesses concurrent original jurisdiction over the subject matter of this Petition based upon Article III, Section 2 of the Constitution of the United States, as this case arises under an Act of Congress properly termed the Jones Act, 46 USC § 30104, *et seq.,* as well as actions for unseaworthiness and product liability under the General Admiralty and Maritime Law wherein Plaintiff, at all times relevant, was a merchant mariner who served his employers aboard ships owned and/or operated by the said Jones Act Defendants, which vessels utilized and carried asbestos and asbestos-containing products and other hazardous products to which Plaintiff was exposed to the detriment of his health. Such exposures occurred in part in Orleans Parish.

5.

The Jones Act and General Admiralty and Maritime Law, provide the law governing this cause of action to the exclusion of state substantive law relating to personal injury.

6.

Plaintiff explicitly disclaims any causes of action or potential recoveries for any injuries caused by any exposures to asbestos that occurred in a federal enclave. Further, Plaintiff explicitly disclaims any causes of action or potential recoveries for any injuries caused by any acts or omissions of a party committed at the direction of an officer of the United States of America.

## PERSONAL JURISDICTION AND VENUE

7.

Defendant BP products North America, Inc. (individually and as successor in interest to Pan American Petroleum and Transport Company), with its principal place of business at 30 South Wacker Drive, Suite 900, Chicago, Illinois 60601, at times relevant herein conducted business in the State of Louisiana.

8.

Defendant CBS Corporation (f/k/a Viacom, Inc., successor by merger to CBS Corporation, f/k/a Westinghouse Electric Company), with its principal place of business at 51 W. 52nd Street, New York, New York 10019, at times relevant herein conducted business in the State of Louisiana.

9.

Defendant Certain-Teed Corporation (f/k/a Certain-Teed Products Corporation), with its principal place of business at Swedesford & Old School Roads, Valley Forge, Pennsylvania 19481, at times relevant herein conducted business in the State of Louisiana.

10.

Defendant Charles Johnson, a domiciliary of Waynesboro, Virginia, whose address is 436 Raleigh Court, Waynesboro, Virginia 22980, at times relevant herein committed acts of negligence in the State of Louisiana.

11.

Defendant Chas. Kurz & Co., Inc., with its principal place of business at 511 Fifth Avenue, New York, New York 10017, at times relevant herein conducted business in the State of Louisiana.

12.

Defendant Chevron U.S.A. Inc. (f/k/a Gulf Oil Corporation), with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583, at times relevant herein conducted business in the State of Louisiana.

13.

Defendant Chiquita Brands International, Inc. (individually and as successor in interest to United Fruit Company), with its principal place of business at 550 South Caldwell Street,

Charlotte, North Carolina 28202, at times relevant herein conducted business in the State of Louisiana.

14.

Defendant Crane Co., with its principal place of business at 100 First Stamford Place, #300, Stamford, Connecticut 06902, at times relevant herein conducted business in the State of Louisiana.

15.

Defendant Farrell Lines (individually and as successor in interest to American Export Lines, Inc.), with its principal place of business at 1 Whitehall Street, New York, New York 10004, at times relevant herein conducted business in the State of Louisiana.

16.

FMC Corporation (individually and as successor in interest to Crosby Valve, Inc. and Peerless Pump Corporation), with its principal place of business at 1735 Market Street, Philadelphia, Pennsylvania 19103, at times relevant herein conducted business in the State of Louisiana.

17.

Foster Wheeler Corporation, with its principal place of business at Lindenstrasse 10 6340, Baar, Switzerland, at times relevant herein conducted business in the State of Louisiana.

18.

General Electric Company, with its principal place of business at 3135 Easton Turnpike, Fairfield, Connecticut 09828, at times relevant herein conducted business in the State of Louisiana.

19.

Hopeman Brothers, Inc., with its principal place of business at PO Box 7524, Charlottesville, Virginia 22906, at times relevant herein conducted business in the State of Louisiana.

20.

Huntington Ingalls Incorporated (f/k/a Northrop Grumman Shipbuilding, Inc.), with its principal place of business at 4101 Washington Avenue, Newport News, Virginia, 23607, at times relevant herein conducted business in the State of Louisiana.

21.

Idex Corporation (f/k/a Viking Pump, Inc.), with its principal place of business at 1925 West Field Court, Suite 200, Lake Forest, Illinois 60045, at times relevant herein conducted business in the State of Louisiana.

22.

Defendant Isbrandtsen Company, Inc., with its principal place of business at 26 Broadway, New York, New York 10004, at times relevant herein conducted business in the State of Louisiana.

23.

Defendant LGS Technologies (f/k/a Longhorn Gasket and Supply), with its principal place of business at 2950 W. Wintergreen Road, Lancaster, Texas 75134, at times relevant herein conducted business in the State of Louisiana.

24.

Defendant Liberty Mutual Group, Inc. (as the insurer of Wayne Manufacturing Co.), with its principal place of business at 175 Berkeley Street, Boston, Massachusetts, at times relevant herein conducted business in the State of Louisiana.

25.

Defendant Maryland Casualty Company (as the insurer of Marquette Insulations, Inc.), with its principal place of business at 1400 American Lane, Schaumburg, Illinois 60196, at times relevant herein conducted business in the State of Louisiana.

26.

Defendant Metropolitan Life Insurance Company, with its principal place of business at 200 Park Avenue, New York, New York 10166, at times relevant herein conducted business in the State of Louisiana.

27.

Defendant National Bulk Carriers, Inc., with its principal place of business at 666 3rd Avenue, #29, New York, New York, 10017, at times relevant herein conducted business in the State of Louisiana.

28.

Defendant Owens-Illinois, Inc., with its principal place of business at 1 Michael Owens Way, Perrysburg, Ohio 43551, at times relevant herein conducted business in the State of Louisiana.

29.

Defendant Texaco, Inc. (f/k/a The Texas Co.), with its principal place of business at 2400 San Ramon Valley Boulevard, San Ramon, California, at times relevant herein conducted business in the State of Louisiana.

30.

Defendant Triplex, Inc., with its principal place of business at 1122 Kress Street, Houston, TX 77020, at times relevant herein conducted business in the State of Louisiana.

31.

Defendant Union Carbide Corporation, with its principal place of business at 39 Old Ridgebury Road, Danbury, Connecticut 06810, at times relevant herein conducted business in the State of Louisiana.

32.

Defendant Warren Pumps, LLC, with its principal place of business at 82 Bridges Avenue, Warren, Massachusetts 01083, at times relevant herein conducted business in the State of Louisiana.

33.

Defendant Weir Valves & Controls USA, Inc. (f/k/a Atwood & Morrill Co., Inc.), with its principal place of business at 29 Old Right Road, Ipswich, MA 01938, at times relevant herein conducted business in the State of Louisiana.

## GENERAL ALLEGATIONS

34.

During Plaintiff's sea service career, he worked abroad vessels owned and/or operated by the Jones Act Defendants, which sailed in Louisiana waters and called on Louisiana ports on numerous occasions while Plaintiff served abroad. While aboard these vessels in the port and in Louisiana waters, he was repeatedly exposed to asbestos. Such vessels included, but were not

limited to, the *Woodstock Victory, Pan Florida, Bulklube, Greeley Victory, Delaware, Tullahoma, Gulfmoon, Barre Victory, Exmouth, Gulfmeadows, Gulfpass, Connecticut, Mission Capistrano, Quirigua, Flying Foam, Dolly Turman, Dick Lykes, Leslie Lykes, Sue Lykes, Eugene Lyke, Helen Lykes, Mayo Lykes, Louise Lykes, Mason Lykes, Doctor Lykes, Genevieve Lykes, Sheldon Lykes, Marjorie Lykes, Ruth Lykes, Almeria Lykes, Abadelle Lykes* and *Tillie Lykes* owned and/or operated by Jones Act Defendants named herein.

35.

Plaintiff boarded the *Woodstock Victory* in Newport News, Virginia on June 5, 1946 and was discharged in Norfolk, Virginia on July 9, 1946.  He also boarded the *Woodstock Victory* in Newport News, Virginia on July 17, 1946 and was discharged in Savannah, Georgia on August 21, 1946.  During these voyages, Mr. Marsh was employed by American Export Lines, Inc. (now Defendant Farrell Lines), and he had significant exposure to asbestos while aboard the *Woodstock Victory*, which was a substantial factor in bringing about his injury.

36.

Plaintiff boarded the *Pan Florida* in Norfolk, Virginia on February 19, 1947 and was discharged in Wilmington, North Carolina on March 19, 1947.  During this voyage, Mr. Marsh was employed by Pan American Petroleum and Transport Company (now Defendant BP Products North America, Inc.), and he had significant exposure to asbestos while aboard the *Pan Florida*, which was a substantial factor in bringing about his injury.

37.

Plaintiff boarded the *Bulklube* in Norfolk, Virginia on May 5, 1947 and was discharged in New York, New York on May 31, 1947.  He also boarded the *Bulklube* in New York, New York on June 1, 1947 and was discharged on June 9, 1947 in Galveston, Texas; and from June 10, 1947 in Norfolk, Virginia to November 2, 1947 in New York, New York.  During these voyages, Mr. Marsh was employed by National Bulk Carriers, Inc., and he had significant exposure to asbestos while aboard the *Bulklube* in Louisiana waters and while at Louisiana ports, which was a substantial factor in bringing about his injury.

38.

Plaintiff boarded the *Delaware* in Norfolk, Virginia on June 14, 1948 and was discharged in Charleston, South Carolina on June 23, 1948. During this voyage, Mr. Marsh was employed by The Texas Co. (now Defendant Texaco, Inc.), and he had significant exposure to asbestos while aboard the *Delaware*, which was a substantial factor in bringing about his injury.

39.

Plaintiff boarded the *Tullahoma* in Baytown, Texas on October 20, 1948 and was discharged in Baltimore, Maryland on October 26, 1948. During this voyage, Mr. Marsh was employed by Chas. Kurz & Co., Inc., and he had significant exposure to asbestos while aboard the *Tullahoma*, in Louisiana waters and while at Louisiana ports, which was a substantial factor in bringing about his injury.

40.

Plaintiff boarded the *Gulfmoon* in Norfolk, Virginia on June 26, 1951 and was discharged in Baltimore, Maryland on July 24, 1951. During this voyage, Mr. Marsh was employed by Gulf Oil Corporation (now Defendant Chevron U.S.A., Inc., and he had significant exposure to asbestos while aboard the *Gulfmoon*, which was a substantial factor in bringing about his injury.

41.

Plaintiff boarded the *Barre Victory* in Norfolk, Virginia on September 26, 1951 and was discharged in Newport News, Virginia on November 8, 1951. During this voyage, Mr. Marsh was employed by Farrell Lines, and he had significant exposure to asbestos while aboard the *Barre Victory*, which was a substantial factor in bringing about his injury.

42.

Plaintiff boarded the *Exmouth* in Norfolk, Virginia on January 22, 1952 and was discharged in New York, New York on February 6, 1952. He also boarded the *Exmouth* on February 7, 1952 in New York, New York and was discharged on March 21, 1952 in New York, New York; from March 22, 1952 in New York, New York to March 31, 1952 in New York, New York; from April 1, 1952 in New York, New York to May 12, 1952 in New York, New York; from May 13, 1952 in New York, New York to May 19, 1952 in Norfolk, Virginia. During these voyages, Mr. Marsh was employed by American Export Lines, Inc. (now Defendant Farrell Lines) and he had

significant exposure to asbestos while aboard the *Exmouth*, which was a substantial factor in bringing about his injury.

43.

Plaintiff boarded the *Gulfmeadows* in Norfolk, Virginia on August 14, 1953 and was discharged in Port Arthur, Texas on October 2, 1953. During this voyage, Mr. Marsh was employed by Gulf Oil Corporation (now Defendant Chevron U.S.A., Inc.), and he had significant exposure to asbestos while aboard the *Gulfmeadows*, in Louisiana waters and while at Louisiana ports, which was a substantial factor in bringing about his injury.

44.

Plaintiff boarded the *Gulfpass* in Port Arthur, Texas on October 20, 1953 and was discharged in Port Arthur, Texas on December 21, 1953. During this voyage, Mr. Marsh was employed by Gulf Oil Corporation (now Defendant Chevron U.S.A., Inc.), and he had significant exposure to asbestos while aboard the *Gulfpass*, in Louisiana waters and while at Louisiana ports, which was a substantial factor in bringing about his injury.

45.

Plaintiff boarded the *Connecticut* in Norfolk, Virginia on March 27, 1954 and was discharged in Port Arthur, Texas on April 11, 1954. He also boarded the *Connecticut* in Port Arthur, Texas on April 12, 1954 and was discharged in New York, New York on May 16, 1954; from May 17, 1954 in New York, New York to June 8, 1954 in Providence, Rhode Island; and from June 9, 1954 in Providence, Rhode Island to July 1, 1954 in New York, New York. During these voyages, Mr. Marsh was employed by The Texas Co. (now Defendant Texaco, Inc.), and he had significant exposure to asbestos while aboard the *Connecticut*, in Louisiana waters and while at Louisiana ports, which was a substantial factor in bringing about his injury.

46.

Plaintiff boarded the *Quirigua* in Baltimore, Maryland on November 13, 1957 and was discharged in New York, New York on November 25, 1957. He also boarded the *Quirigua* in New York, New York on November 26, 1957 and was discharged in Baltimore, Maryland on December 15, 1957; from December 16, 1957 in Baltimore, Maryland to January 6, 1958 in Baltimore, Maryland; from January 7, 1958 in New York, New York to January 26, 1958 in

Baltimore, Maryland; from January 27, 1958 in Baltimore, Maryland to February 17, 1958 in New

York, New York; from February 18, 1958 in New York, New York to March 9, 1958 in Baltimore,

Maryland; from March 26, 1958 in New York, New York to April 9, 1958 in New York, New

York; from April 10, 1958 in New York, New York, to April 21, 1958 in New York, New York;

from April 22, 1958 in New York, New York to May 5, 1958 in Baltimore, Maryland; from May

6, 1958 in Baltimore, Maryland to May 18, 1958 in Baltimore, Maryland; from June 5, 1958 in

Baltimore, Maryland to June 19, 1958 in New York, New York; from July 9, 1958 in New York,

New York to July 21, 1958 in New Orleans, Louisiana; from July 22, 1958 in New Orleans,

Louisiana to August 10, 1958 in Baltimore, Maryland; and from August 11, 1958 in Baltimore,

Maryland to August 12, 1958 in Newport News, Virginia.  During these voyages, Mr. Marsh was

employed by United Fruit Company (now Defendant Chiquita Brands International, Inc.), and he

had significant exposure to asbestos while aboard the *Quirigua*, in Louisiana waters and while at

Louisiana ports, which was a substantial factor in bringing about his injury.

47.

Plaintiff boarded the *Flying Foam* in Norfolk, Virginia on September 4, 1958 and was

discharged in Norfolk, Virginia on October 7, 1958.  During this voyage, Mr. Marsh was employed

by Isbrandtsen Company, Inc., and he had significant exposure to asbestos while aboard the *Flying*

*Foam*, which was a substantial factor in bringing about his injury.

48.

During the above-mentioned periods of time Plaintiff was frequently and regularly exposed

to and did inhale or otherwise ingest harmful asbestos particles and dust.

49.

On or about the entirety of his sea service career, Plaintiff was required by his employers

to perform duties which included the constant exposure to asbestos friable fibers causing him to

breath into his system carcinogenic asbestos dust resulting in harm to Plaintiff, including malignant

mesothelioma.  These events of harm occurred constantly and while in many waters and ports-of-

call wherein venue, no matter where laid, is inconvenient to the numbers scattered parties herein,

along with multiple witnesses thereto.

50.

The asbestos and asbestos-containing products found abroad the vessels upon which Plaintiff sailed are known to be highly toxic to mankind, and the human body can be contaminated by asbestos and asbestos-containing products through inhalation and ingestion.

51.

Defendants, all of them, knew or should have known, of the dangers associated with exposure to asbestos and asbestos-containing products in the workplace.

52.

Plaintiff was exposed to dangerous and unlawful concentrations of asbestos in the ambient air, in potable water and food furnished by his employer due to his assigned work and/or in close proximity of said asbestos and asbestos-containing products.

53.

Defendants, all of them, knew with substantial certainty that harmful contact with Plaintiff's person would result from his exposure to asbestos present aboard the vessels upon which he served through the products that were produced and/or supplied to or brought aboard the vessels upon which Plaintiff worked.

54.

The Asbestos Defendants knew, at times relevant herein, that its asbestos and/or asbestos-containing products posed a significant risk to human health, through inhalation and ingestion, and yet the Asbestos Defendant with willful and wanton disregard for Plaintiff's safety and human health, failed to test and/or reveal their test results, failed to warn users of the dangers of exposure to said products in marketing and/or placing said products into the stream of commerce.

55.

Harmful contamination with Plaintiff's person occurred due to the asbestos and asbestos-containing products found and/or utilized aboard the vessels upon which Plaintiff sailed including, but not limited to, the asbestos and asbestos-containing products that the Asbestos Defendants produced and/or supplied, and Plaintiff was in fact injured as a result of his continued exposure to said products during the course of his career as a mariner.

56.

Defendants, jointly and severally, breached their duty to Plaintiff in the following particulars, including but not limited to:

(a)     Failed to adequately warn Plaintiff of the dangerous characteristics of asbestos and asbestos-containing products;

(b)     Failed to provide Plaintiff with the information as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, to protect Plaintiff from being harmed and disabled by exposure to asbestos and asbestos-containing materials;

(c)     Failed to place adequate warnings on said asbestos and asbestos-containing materials, to warn of the health hazards associated with coming in contact with said products.

(d)     Failed to exercise reasonable care to publish, adopt and enforce safety plans and/or a safe method of handling and installing asbestos and asbestos-containing materials;

(e)     Failed to adopt and utilize a substitute material to eliminate asbestos fibers in the products produced and/or utilized aboard the aforestated vessels;

(f)     Failed to test asbestos and asbestos-containing material to determine their disease causing propensities prior to distributing and/or utilizing releasing these products, and if in fact any Defendant tested these products, then said Defendants were negligent in concealing the results from the public;

(g)     Failed to warn of the scientifically recognized synergism between exposure to asbestos in conjunction with smoking and other agents;

(h)     Failed to act in a reasonable and prudent manner.

57.

As a direct and proximate result of Defendants' aforementioned tortious acts, Plaintiff sustained serious, incurable and progressive asbestos-related disease.  Plaintiff contracted an asbestos-related disease, and suffered other bodily injuries including: great pain of mind and body, shock, disgrace, outrage, humiliation, indignity, disability, loss of the joys, pleasures and vitalities of life, and exacerbation of existing disease.

58.

Plaintiff developed malignant mesothelioma, and as a result, was extremely fearful of developing severe illnesses and/or extremely fearful of the ravages of such illnesses from which he suffered.

59.

Plaintiff experiences severe mental anguish, great pain and suffers the ravages of asbestosis, malignant mesothelioma and/or progressive shortness of breath.

60.

As a result of Plaintiff's asbestos-related condition, he suffers great pain of mind and body.

61.

Plaintiff has incurred and continues to incur medical bills and other expenses.

62.

Plaintiff sustained wage losses in an indeterminate amount, which amount will be demonstrated at trial.

## MANUFACTURERS' LIABILITY

63.

At all times relevant hereto, Defendant **ANCO INSULATIONS, INC.,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

64.

At all times relevant hereto, Defendant **A.W. CHESTERTON COMPANY,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

65.

At all times relevant hereto, Defendant **BAYER CROPSCIENCE, INC.,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

66.

At all times relevant hereto, Defendant **BEXAR CANYON MANAGEMENT, INC.,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

67.

At all times relevant hereto, Defendant **CBS CORPORATION**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

68.

At all times relevant hereto, Defendant **CERTAIN-TEED CORPORATION,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

69.

At all times relevant hereto, Defendant **CRANE CO.**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

70.

At all times relevant hereto, Defendant **CRESCENT MATERIALS SERVICE INCORPORATED,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

71.

At all times relevant hereto, Defendant **CSR, LIMITED**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

72.

At all times relevant hereto, Defendant **FMC CORPORATION (individually and as successor in interest to Peerless Pump Corporation)**, designed, evaluated, manufactured,

packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

73.

At all times relevant hereto, Defendant **FOSTER WHEELER CORPORATION,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

74.

At all times relevant hereto, Defendant **GENERAL ELECTRIC COMPANY**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

75.

At all times relevant hereto, Defendant **GOULDS PUMPS (IPG), INC.,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

76.

At all times relevant hereto, Defendant **GREFCO, INC.,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

77.

At all times relevant hereto, Defendant **HOPEMAN BROTHERS, INC. (individually and as successor to Wayne Manufacturing Company)** manufactured, distributed and installed asbestos-containing products that were used at Avondale Shipyard, including but not limited to Micarta wall board. Hopeman Brothers, Inc. (hereinafter "Hopeman Brothers") is strictly liable for manufacturing defective products which caused plaintiff harm. Additionally, **HOPEMAN BROTHERS** is liable for the reasons set forth in the following paragraph.

78.

Wayne Manufacturing Company manufactured and distributed asbestos containing products, specifically laminated wall boards on panels, consisting of marinite panels manufactured

and distributed by Johns Manville Corporation and Micarta manufactured and distributed by Westinghouse Electric Corporation, which were used at Avondale Shipyard.

79.

Upon information and belief, Defendants **HOPEMAN BROTHERS**, was negligent in the handling of asbestos at Avondale Shipyard at times when plaintiff was *not* employed by them, but during which times defendants owed a duty to protect bystanders from the hazards posed by their operations. Hopeman Brothers failed to warn of these known hazards.

80.

Defendants **HOPEMAN BROTHERS** negligently breached their duty to protect bystanders from the hazards of asbestos, which breach resulted in injury and disease to the plaintiff. Defendant's negligence in the handling of asbestos included, but was not limited to:

a)   failure to warn of the hazards of exposure to asbestos dust;

b)   failure to implement proper industrial hygiene procedures to prevent exposure to bystanders;

c)   sawing, cutting and otherwise handling asbestos containing products resulting in the production of significant quantities of airborne asbestos; and

d)   failure to provide adequate respiratory protection equipment to bystanders known to be working in the vicinity of respirable asbestos products.

81.

At all times relevant hereto, Defendant **HUNTINGTON INGALLS INCORPORATED (hereinafter "Avondale Shipyard")** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites and premises including, but not limited to, the vessels upon which Plaintiff was exposed.

82.

Avondale Shipyard delegated duties to its safety department, and more particularly to Burnett "Frenchy" Bordelon, John Chantrey, Peter Territo, Philip O'Donnell, George Kelmell, and Steve Kennedy, Lou Cognevich, Raymond Young, Tommy Valle, Malcolm Fontenotte, J. D. Roberts, Ewing Moore, Rodney Duhon, Dewayne Clark, Sr., William Harmeyer, R. F. Brunner,

Kenneth Genter, A. J. Oberfell, Ollie Gatlin, Charles "Chuck" Starkenburg and Paul Tregre and its superintendents, more particularly, Albert Bossier. These named individuals each had the responsibility of providing a safe place to work and safety equipment with which to conduct work; however, they negligently failed to protect plaintiff from the dangers of toxic fiber and dust exposure. These named individuals breached their individual duties to plaintiff herein and are amenable to suit under La. R.S. 22:655 and 22:983(e) in regard to both the construction and repair of the vessels upon which Plaintiff was exposed.

83.

Peter Territo, Ollie Gatlin, Charles Johnson and their respective executive officers are jointly, severally, and in solido, liable to plaintiff for the following acts of negligence:

a)      Failure to maintain its premises in a safe condition;

b)      Failure to provide petitioner with proper safety equipment;

c)      Failure to warn of a hazardous and perilous condition;

d)      Failure to exercise due care and caution for the safety and integrity of the premises;

e)      Failure to provide adequate monitoring and maintenance of the premises;

f)      Failure to adequately supervise the employees responsible for maintaining the safety and integrity of the premises;

g)      Failure to adequately warn of the dangers of the premises; and

h)      Any and all acts of negligence which may be proven at a trial of this matter.

84.

At all times relevant hereto, Defendant **IDEX CORPORATION**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

85.

At all times relevant hereto, Defendant **INGERSOLL-RAND COMPANY**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

86.

At all times relevant hereto, Defendant **INTERNATIONAL PAPER COMPANY (f/k/a Champion International Corporation, f/k/a U.S. Plywood Corporation)**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

87.

At all times relevant hereto, Defendant **JOHN CRANE, INC.**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

88.

At all times relevant hereto, Defendant **LGS TECHNOLOGIES**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

89.

At all times relevant hereto, Defendant **LIBERTY MUTUAL GROUP, INC.**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

90.

At all times relevant hereto, Defendant **MARYLAND CASUALTY COMPANY**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

91.

At all times relevant hereto, Defendant **METROPOLITAN LIFE INSURANCE COMPANY,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

92.

At all times relevant hereto, Defendant **OWENS-ILLINOIS, INC.,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

93.

At all times relevant hereto, **TAYLOR-SEIDENBACH INCORPORATED**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos containing products to Plaintiff's exposure sites.

94.

At all times relevant hereto, Defendant **THE McCARTY CORPORATION**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

95.

At all times relevant hereto, Defendant **TRIPLEX, INC**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

96.

At all times relevant hereto, Defendant **UNION CARBIDE CORPORATION**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

97.

At all times relevant hereto, **WARREN PUMPS, L.L.C.,** designed, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos containing products to Plaintiff's exposure sites.

98.

At all times relevant hereto, **WEIR VALVES & CONTROLS USA INCORPORATED (f/k/a Atwood & Morrill Co., Inc.),** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos containing products to Plaintiff's exposure sites.

99.

The manufacturer Defendants listed above, not the premise owner defendants who may have also been mentioned above, are individually, jointly and severally, and *in solido*, strictly liable to the petitioner because the asbestos containing products designed, manufactured, assembled, fabricated, supplied, sold, marketed, warranted, advertised and/or used by Defendants were defective and unreasonably dangerous per se, and were the producing cause of injury to petitioner.

100.

These Defendants designed, manufactured, fabricated, assembled, supplied, sold, marketed, warranted and/or advertised asbestos and/or asbestos containing products or material, including but not limited to packing, fire bricks, floor tile, cement, felt, paper, pipe covering, block insulation, rope sealants and mastics, sheets, adhesives, refractory material, refractory tile, gaskets, sheet gasket material, mortar, fire clay, and boiler gaskets, the asbestos fibers and/or dust from which was inhaled or otherwise ingested by Plaintiff

101.

Defendants are also liable, individually, jointly and severally, and *in solido*, to the petitioner for and are guilty of the following:

1) manufacturing a product defective in design;

2) failing to properly test their products;

3) failing to properly warn against the dangers inherent in the use of their products;

4) failing to provide proper instructions in the use of its products;

5) failing to furnish proper wearing apparel, masks, respirators, or other devices that might reduce the dangers of the use of their products;

6) failing to instruct or warn of the proper safety devices so as to reduce the dangers of their products; and,

7) Any and other acts of negligence to be shown at the trial of this matter.

102.

As a direct and proximate result of the above described acts of each of the Defendants, Plaintiff sustained injuries.

## STRICT LIABILITY

103.

Further, these Asbestos Defendants expressly and impliedly warranted to users and/or consumers such as petitioner that their products were reasonably fit for its intended use without endangering human life, and that their products were of merchantable quality.

104.

These Defendants breached the expressed and implied warranty in that their product was defective, which defects in their product permitted and/or caused the injuries to petitioner while using and/or being exposed to their products in a manner that was reasonably foreseeable.

105.

As a direct and proximate result of the described breaches of warranty by Defendants, Petitioner sustained injuries.

106.

Petitioner is uncertain whether or not he was exposed to asbestos products at or as a result of work sites other than the ones enumerated *supra*, but he reserves the right to assert at trial that he was so exposed at other sites, should such evidence develop. Petitioner avers that should such evidence develop, he will promptly notify Defendants well in advance of trial.

## DISTRIBUTOR'S LIABILITY

107.

Defendants, **ANCO INSULATIONS, INC., A.W. CHESTERTON COMPANY, BAYER CROPSCIENCE, INC. (as successor to Rhone Poulenc AG Company, f/k/a Amchem Products, Inc., f/k/a Benjamin Foster Company), BEXAR CANYON MANAGEMENT, INC. (f/k/a H.B. Zachry Company), CBS CORPORATION (a Delaware corporation, f/k/a Viacom, Inc., successor by merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation), CERTAIN-TEED CORPORATION (f/k/a Certain-Teed Products Corporation), CHARLES JOHNSON, CRANE CO., CRESCENT MATERIALS SERVICE, INC., CSR, LIMITED, FMC CORPORATION (individually and as successor in interest to Crosby Valve, Inc. and Peerless Pump Corporation), FOSTER WHEELER CORPORATION, GENERAL ELECTRIC**

COMPANY,  GOULDS PUMPS, LLC, GREFCO, INC., HOPEMAN BROTHERS, INC., HUNTINGTON INGALLS INCORPORATED (f/k/a Northrop Grumman Shipbuilding, Inc.), IDEX CORPORATION (f/k/a Viking Pump, Inc.), INGERSOLL-RAND COMPANY, INTERNATIONAL PAPER COMPANY (f/k/a Champion International Corporation, f/k/a U.S. Plywood Corporation), JOHN CRANE, INC., LGS TECHNOLOGIES (f/k/a Longhorn Gasket and Supply), LIBERTY MUTUAL GROUP, INC. (as the insurer of Wayne Manufacturing Co.), MARYLAND CASUALTY COMPANY (as the insurer of Marquette Insulations, Inc.), METROPOLITAN LIFE INSURANCE COMPANY, OWENS-ILLINOIS, INC., TAYLOR-SEIDENBACH, INC., THE McCARTY CORPORATION, TRIPLEX, INC., UNION CARBIDE CORPORATION, WARREN PUMPS, LLC, AND WEIR VALVES & CONTROLS USA, INC. (f/k/a Atwood & Morrill Co., Inc.), are liable as distributors, suppliers, installers and re-labelers of products containing asbestos which were defective and unreasonably dangerous per se and were the producing cause of injury to Petitioner. These Defendants will be collectively referred to hereinafter as "Defendant Distributors":

a) Defendant Distributors intentionally failed to warn Petitioner of the known foreseeable dangers of use of the products manufactured, distributed and/or sold;

b) Defendant Distributors knew, or in the exercise of reasonable care, should have known that their insulation products were in a defective condition and unreasonably dangerous, and that their use would cause Petitioner's disease;

c) Defendant Distributors failed to test their products concerning the effect of inhalation or asbestos dust fibers and the ingestion of other materials contained in the insulation upon the human body;

d) Defendant Distributors failed to warn Petitioner of the dangers of working with or around their asbestos containing products;

e) Defendant Distributors failed to either furnish proper wearing apparel, masks, respirators or other devices that might reduce the dangers of the use of their products, and failed to instruct or warn of the proper safety devices so as to reduce the dangers of their products;

f)  Defendant Distributors knew that their products would have to be cut, sawed, broken, sprayed, hammered into place, and generally handled in such a manner as to create dust which when ingested into the body would cause severe, permanent and disabling diseases such as asbestosis and mesothelioma;

g)  Defendant Distributors knew that there were substantial products that would serve the purpose of high heat insulation which did not contain asbestos, and further knew that said substitute products would not cause severe, permanent and disabling harm to the body of users or consumers; and

h)  Any and all other acts of negligence that will be shown at the trial of this matter.

108.

At all times mentioned herein, all Defendants whether corporations or individuals, are individually, jointly, severally, and in solido liable unto petitioner for the damages asserted herein.

Defendants are liable to petitioner for the following damages:

(a)  Physical pain and suffering;

(b)  Mental pain and anguish;

(c)  Loss of enjoyment of life;

(d)  Medical expenses and funeral expenses;

(e)  Loss of wages, past and future;

(f)  Loss of wage earning capacity;

(g)  Fear of death;

(h)  Loss of service and society;

(i)  Loss of consortium; and

(k)  Any and all damages which shall be shown at the trial of this matter.

## JONES ACT DEFENDANTS' LIABILITY
## JONES ACT CLAIM

NOW COMES Plaintiff and hereby re-alleges and incorporates by reference all of the previous allegations set forth above and further states as against the Jones Act Defendants, that:

109.

As a direct approximate result of the negligence under the Jones Act, 46 USCS. § 30104, Plaintiff suffered from lung cancer, along with the sequella thereof.

The Jones Acts Defendants were negligent in their failure:

(a)   To provide adequate warning to the crew, including Plaintiff, of the hazards of asbestos utilized and/or carried shipboard;

(b)   Failed to provide Plaintiff with the information as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, to protect Plaintiff from being harmed and disabled by exposure to asbestos and asbestos-containing materials;

(c)   Failed to place adequate warnings on, near or with said asbestos and asbestos-containing materials, to warn of the health hazards associated with coming in contact with said products.

(d)   Failed to exercise reasonable care to publish, adopt and enforce safety plans and/or a safe method of handling and installing asbestos and asbestos-containing materials;

(e)   Failed to adopt and utilize a substitute material to eliminate asbestos fibers in the products produced and/or utilized aboard the aforestated vessels;

(f)   Failed to test asbestos and asbestos-containing material to determine their disease causing propensities prior to distributing and/or utilizing and/or releasing these products, and if in fact any Jones Act Defendant tested these products, then said Jones Act Defendants were negligent in concealing the results from the public;

(g)   Failed to provide a reasonably safe workplace; and

(h)   Failed to act in a reasonable and prudent manner.

110.

As a direct and proximate result of the acts and omissions aforestated by each of the named Jones Act Defendants, Plaintiff sustained injuries as contemplated in *American Fire & Casualty Company v. Flynn*, 341 U.S. 6, 71 S. Ct. 534 (1951).  Plaintiff seeks damages as below stated, *inter alia*:

(a)   Loss of earnings and earnings capacity;

(b)   Conscious pain and suffering, past and future;

(c)   Mental anguish, fright and shock, embarrassment, humiliation or mortification, past or future;

(d)   Medical expenses and costs;

(e)    Household services;

(f)    Loss of pleasure, including social and recreational amenities, past and future;

(g)    Any and all other elements of damages cognizable in law or which may be raised, pleaded and proved by the Plaintiffs during the pendency of this cause and at the time of trial.

WHEREFORE, Plaintiff demands judgment against Jones Act Defendants, jointly and severally, in an amount reasonable in the premises, and Plaintiff further seeks interest and costs to be taxed in accordance with law and such other and further measures of relief as the Court may determine to be appropriate and just in the premises.

**JONES ACT DEFENDANTS' LIABILITY**
**UNSEAWORTHINESS UNDER GENERAL ADMIRALTY AND MARITIME LAW**

NOW COMES Plaintiff and hereby re-alleges and incorporates by reference all the previous allegations set forth above and further states as against Jones Act Defendants that:

111.

As a direct and proximate result of the negligence of the unseaworthiness of the vessels, Plaintiff suffers from lung cancer, along with the sequella thereof.

112.

The vessels owned and/or operated by Jones Act Defendants were unseaworthy under the General Admiralty and Maritime Law in that their vessels presented an unreasonably unsafe working environment, whereby the Jones Act Defendants substantially breached the implied warranty of providing a reasonably safe vessel and working conditions, which was to be reasonably fit for the purpose for which it was intended.

113.

The vessels were unseaworthy in part due to their lack of necessary equipment to perform tasks in safety; the lack of adequate training and supervision in the use of a carcinogenic known as asbestos and the lack of adequate ventilation and personal protective measures to reduce the risk of injury to the crew.

114.

Jones Act Defendants knew or had reason to know of the hazards of asbestos and asbestos-containing products, or in the exercise of reasonable care, should have known of these hazards years prior to Plaintiff's service aboard the Jones Act Defendants' vessels. Notwithstanding this knowledge, the Jones Act Defendants' vessels were unseaworthy in part due to their lack of

necessary equipment to perform tasks in safety; their lack of a warning of the dangerous characteristics of asbestos and asbestos-containing products; their lack of a published, adopted and enforced safety plan for a safe or more safe method of handling, installing, maintaining and working with or near asbestos and asbestos-containing materials; the lack of a safe workplace; the lack of adequate training and supervision in the use of a carcinogen known as asbestos and the lack of adequate ventilation and personal protective measures to reduce the risk of injury to the crew; and further failed to provide personal protective measures and devices in a willful and conscious disregard for the safety of the Plaintiff, and others, causing Plaintiff's exposure to asbestos and resulting lung cancer.

115.

As a direct and proximate result of the acts and omissions aforestated by each of the named Jones Act Defendants, Plaintiff sustained injuries as contemplated in *American Fire & Casualty Company v. Flynn*, 341 U.S. 6, 71 S. Ct. 534 (1951). Plaintiff seeks damages as below stated, *inter alia*:

(a)   Loss of earnings and earnings capacity;

(b)   Conscious pain and suffering, past and future;

(c)   Mental anguish, fright and shock, embarrassment, humiliation or mortification, past or future;

(d)   Medical expenses and costs;

(e)   Household services;

(f)   Loss of pleasure, including social and recreational amenities, past and future;

(g)   Loss of society and companionship; and

(h)   Any and all other elements of damages cognizable in law or which may be raised, pleaded and proved by the Plaintiffs' during the pendency of this cause and at the time of trial.

WHEREFORE, Plaintiff demands judgment against the Jones Act Defendants, jointly and severally, in an amount reasonable in the premises, and Plaintiff further seeks interest and costs to be taxed in accordance with law and such other and further measures of relief as the Court may determine to be appropriate and just in the premises.

## LIABILITY OF METROPOLITAN LIFE INSURANCE COMPANY
## SARANAC LABORATORY BACKGROUND

116.

On January 15, 1935, in Pittsburgh, Pennsylvania, during a symposium sponsored by the Mellon Institute of Industrial Research, a representative of Johns-Manville as representative of the Asbestos Industry, Dr. A.J. Lanza, Assistant Medical Director of the Metropolitan Life Insurance Company, and Dr. Donald E. Cummings, Assistant Director of the Saranac Laboratory for the Study of Tuberculosis, met with other members of U.S. Industry to formulate a plan concerning the "dust problem" attendant to all the industries present.  It was recognized at this meeting that only two forms of dust, namely, free silica and asbestos, were definitely known to produce disabling fibrosis of the lung.   At this symposium, common problems to all industries were identified and there was discussion on how to best resolve these problems.

117.

In 1936, the Asbestos Industry decided not to cooperate with other industries, but instead concluded that it would be more beneficial to their interest to operate and control an independent and prominent scientific institute, the Saranac Laboratory. The Saranac Laboratory in upstate New York was a leading research facility on industrial and infectious pulmonary diseases in the United States and had previously enjoyed a close and confidential relationship with the Metropolitan Life Insurance Company, a major underwriter of insurance to the Asbestos Industry.  Metropolitan Life Insurance Company had made substantial contributions to the Saranac Laboratory for help with medical/legal problems concerning its industry insurance.

118.

In November, 1936, the President of Johns-Manville and its attorney, Mr. Vandiver Brown, had a conference with Dr. Leroy U. Gardner of the Saranac Laboratory along with Dr. Lanza and Dr. McConnell of the Metropolitan Life Insurance Company to discuss the asbestos medical situation as it related to the Asbestos Industry.  It was decided at this meeting that Dr. Gardner's laboratory at Saranac would be used by the Asbestos Industry conspirators to generate and disseminate only favorable information regarding asbestos disease, so that this "independent" favorable information could be submitted to the public health officials and compensation

commissions of the various states when the question of asbestosis arose. This move was calculated to combat any adverse publicity. It was decided that the information obtained would also be distributed to the medical community and the public at large provided it was of the "right" type and only if it would not injure the asbestos companies.

119.

On November 10, 1936, Vandiver Brown of Johns-Manville wrote to F.H. Schluter, President of co-conspirator Thermoid Rubber Company concerning this conference with Dr. Gardner and Dr. Lanza at Saranac. Mr. Brown related the information about the asbestos situation in the Asbestos Industry and confirmed the need for studies paid for by the Industry working as a whole which could be used for future compensation suits.

120.

On Tuesday, November 17, 1936, a meeting was held at the Biltmore Hotel with conspirators Johns-Manville, represented by Mr. Brown; Thermoid Rubber Company, represented by Mr. Schluter; Keasbey and Mattison Company, represented by Mr. A.S. Blagden; Asbestos Manufacturing Company, represented by Mr. H.D. Lamont; Russell Manufacturing Company, represented by Mr. G.M. Williams; and Raybestos Manhatten, Inc., represented by its president, Mr. Sumner Simpson. At this meeting, it was decided that Dr. Gardner's Saranac Laboratory would be employed to conduct and disseminate favorable studies for the Asbestos Industry. Additionally, the conspirators agreed that the results obtained from any such studies by Dr. Gardner and Saranac Laboratory would be considered the property of those advancing the required funds for the studies, who would then determine whether, to what extent, and in what manner the results of any such studies would be made public. Finally, these deceptive practices were culminated by the agreement that no information would be published prior to approval of each conspirator.

121.

Johns-Manville Corporation agreed to make the payments for the studies directly to the Saranac Laboratory and be reimbursed by the other Asbestos Industry conspirators.

122.

Dr. A.J. Lanza of Metropolitan Life was selected to coordinate the activities between Dr. Gardner of the Saranac Laboratory and the Asbestos Industry, along with Attorney Vandiver Brown of Johns-Manville.   Mr. Brown in turn enlisted the aid, support, and complicity in the conspiracy of Mr. Ivan Sabourin of the Quebec Asbestos Mining Association.

123.

On November 20, 1936, a memorandum of agreement between Dr. Gardner of the Saranac Laboratory and the asbestos conspirators was executed and signed by the agents of the American Brake Block Corporation, the Asbestos Manufacturing Company, the Keasbey and Mattison Company, Raybestos Manhattan, Inc., Gatke Corporation, Johns-Manville Corporation, Russell Manufacturing Company, Union Asbestos and Rubber Company, and the United States Gypsum Company.  Thermoid Rubber Company did not sign the November 20, 1936 agreement; however, they later contributed annually to support the Saranac studies in furtherance of the conspiracy.

124.

Under this agreement, the above named conspirators acquired the power to decide what information Saranac Laboratories could publish about asbestos disease, in what form, and where such publications were to occur.  This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study.  On numerous occasions thereafter, as will be outlined below, these conspirators exercised this power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of material fact being made at scientific meetings, in scientific journals, at medical schools and universities, and to the United States Public Health Service, and to the public health services of the various states.

125.

On November 23, 1936, Dr. Gardner of Saranac Laboratory confirmed to Vandiver Brown of Johns-Manville the authorization to proceed with his experiment at a $5,000 annual sum for three years.  Dr. Gardner agreed to the secrecy provisions and agreed to obtain approval of the co-conspirators before any publications were made.

126.

Dr. Gardner's agreement concerning secrecy and non-publication of results without prior approval was scrupulously monitored by Dr. Lanza and Attorney Brown on behalf of the Asbestos Industry, throughout the beginning of the conspiracy and continuing into the mid-1950's when the Saranac Laboratory was closed.

127.

Dr. Gardner at Saranac Laboratory informed Vandiver Brown on February 24, 1943, that he had at last succeeded in analyzing most of the experimental data which had been started in 1936. In a letter to Mr. Brown of that date, he attached a report entitled "Outline of Proposed Monograph on Asbestosis", which monograph included as Part I an essay on human asbestosis and as Part II an essay on experimental asbestosis. Dr. Gardner informed Mr. Brown in this letter that as a result of his experiments, the question of cancer susceptibility was more significant than Dr. Gardner had previously believed. In fact, Dr. Gardner believed that he should continue this cancer susceptibility research and hoped to obtain further funding from the National Cancer Institute. Dr. Gardner further informed Mr. Brown that his work on methods of dust determination was important enough to include in his study because he had found that the current method was deceptive. This finding was significant in the prevention of the asbestosis disease because Dr. Gardner had concluded that there was no practical way to prevent the occurrence of asbestosis after exposure to asbestos dust. Thus, the chief means of controlling the disease would be through control of the air and fiber content to which workers were exposed.

128.

On March 8, 1943, Mr. E. Mueleck, agent of Keasbey and Mattison, wrote to Mr. W.F. Shephard, agent of T&N, PLC, forwarding a copy of Dr. Gardner's proposed monograph on asbestosis, telling him that the other conspirators felt that all references to the question of cancer susceptibility should be omitted from the published report.

129.

Dr. Gardner, who was still bound by the secrecy provisions of the original 1936 Saranac agreement, nevertheless felt that his findings concerning the possibility of carcinogenic action of asbestos fibers was important enough to make a request to Dr. Ludwick Hektoen, Chairman of the

Committee on Cancer Research of the National Cancer Institute, for further cancer studies.  Dr. Gardner informed Dr. Hektoen that he was startled to discover that a small group of mice showed an excessive incidence (81.8%) of pulmonary cancer.  Dr. Gardner explained that he would have attached little importance to this figure except for the fact that scientific literature had now reported ten cases of pulmonary cancer in cases of human asbestosis.

130.

On June 9, 1943, Dr. Gardner again wrote to Vandiver Brown emphasizing his concern with continuing his cancer studies.   Dr. Gardner, however, reassured Mr. Brown that until he received the necessary funds from the National Cancer Institute for the confirmatory animal studies that he would maintain the agreement of secrecy and say nothing about his observations of cancer.

131.

On September 29, 1943, Dr. Gardner again wrote to Dr. Hektoen at the National Cancer Institute for an answer to his request for funds.  Dr. Gardner described asbestosis as being next to silicosis on the issue of industrial disease importance.

132.

Because of the efforts of the co-conspirators, Dr. Gardner's request for cancer studies was denied.  Most notably were the efforts of Dr. Lanza during the proceedings of the twenty-fourth meeting of the National Advisory Council of the National Cancer Institute held on January 8, 1944 and resulted in the denial for further studies.

133.

On October 24, 1946, Dr. Gardner died. After Dr. Gardner's death, Dr. Lanza visited the Saranac Laboratory and took Dr. Gardner's unfinished report about his asbestosis experiments and represented to the other conspirators that he had Dr. Gardner's note typed from the handwritten form.

134.

On January 21, 1947, at the Johns-Manville general headquarters, Dr. Lanza met with various members and officers of the Johns-Manville Corporation to discuss the late Dr. Gardner's asbestos experiments.  It was decided at this meeting that Dr. Kenneth Lynch at the medical school in Charleston, South Carolina would be asked to review the material and to inform the conspirators

through Dr. Lanza on whether Dr. Lynch would be able to put Dr. Gardner's material into "publishable" form.  Mr. Brown, attorney for Johns-Manville, reminded Dr. Lanza and the others that there would be no publication of the results of the experiments without the conspirators' consent, and further, that no part of the report could include objectional material from the industry point of view, pointing out specifically Dr. Gardner's conclusion about the relationship between asbestos dust and cancer, which Dr. Gardner had previously made in his monograph on asbestosis as cited above.

135.

On June 30, 1947, Dr. Kenneth Lynch, Dean of the Charleston Medical School, informed the conspirators, through a letter to Dr. Lanza, that Dr. Gardner's manuscript should be submitted for publication practically as written. Dr. Lynch pointed out that to corroborate with Dr. Gardner, posthumously, by altering his manuscript, without Dr. Gardner's having contemplated those changes, would not be proper.

136.

Because of Dr. Lynch's refusal to change Dr. Gardner's manuscript, the conspirators decided to use Dr. Arthur Vorwald, the new medical director at the Saranac Laboratory, to make the conspirators' requested changes.  On March 15, 1948, Mr. J.P. Woodard of Johns-Manville wrote to Dr. Lanza that he had just paid Dr. Vorwald "our contribution for the current year".  Mr. Woodard also requested Dr. Lanza to pressure Saranac Laboratory to get the asbestos diatomaceous earth studies in "publishable" form soon, noting considerable agitation, both in Canada and on the West Coast.

137.

On October 12, 1948, Thomas Durkin of the Saranac Laboratory informed Mr. Woodard of Johns-Manville that Dr. Vorwald had finally produced a new edition of Dr. Gardner's report which Mr. Durkin forwarded to Mr. Woodard with fifteen copies.   Mr. Durkin further informed Mr. Woodard that the report was complete except for a minor section devoted to lung cancer, and that Saranac Laboratory and Dr. Vorwald were beginning preparation of the final portion of the report, that portion dealing with human asbestosis.

138.

On October 22, 1948, Mr. Brown wrote to conspirators Ernest Mueleck and J.F.D. Rohrbac of Keasbey and Mattison, forwarding Dr. Vorwald's version of Dr. Gardner's report.   Mr. Brown suggested the elimination of all references to tumors and also to pneumonia.  Mr. Brown also stated that this report must be confined to the results of experiments with animals, and not be considered as the first part of a study of the effect of asbestos dust on both animals and human beings, because Dr. Vorwald, who had succeeded Gardner at Saranac Laboratory, and who did not sign the original agreement, would be more difficult to deal with when it came time to making the changes demanded by the conspirators.

139.

On October 27, 1948, Vandiver Brown of Johns-Manville wrote to all of the other conspirators sending them copies of Dr. Vorwald's report.  He admonished his co-conspirators to treat the report with utmost confidence and to make it available to no one outside of the organization.  Mr. Brown also warned his co-conspirators to return all drafts of the report to him because it was obviously undesirable that the report receive any distribution or publicity outside a limited number of people and the respective conspirators' organizations.

140.

On October 28, 1948, Mr. Mueleck, the President of Keasbey and Mattison, replied to co-conspirator Vandiver Brown of Johns-Manville, thanking him for the September 30, 1948 report. Mr. Mueleck outlined his comments about changes that were necessary to be made before the report was published and emphasized to Mr. Brown that the report was confidential and the property of those who advanced the funds for carrying out the experiments at the Saranac Laboratory.

141.

On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation:  American Brake Block, a Division of American Brake and Shoe Foundry, Gatke Corporation, Keasbey and Mattison Company (alter ego to conspirator T&N), Raybestos Manhattan, Inc., Thermoid Company, Union Asbestos and Rubber

Company and United States Gypsum Company, whose interests were represented at the meeting by Mr. Brown of Johns-Manville.

142.

At this November 11, 1948 meeting, these conspirators and their representatives decided to exert their influence to alter materially and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratory in 1936 as discussed above. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of critical review of the then existing dust standards for the health effects of asbestos on humans with asbestos and asbestos products. The standard sampling techniques of the day and the technique recommended by the co-conspirators to the United States Public Health Service and state public health agencies was the counting of only total particles rather than fiber when the conspirators knew that the harmful portion of asbestos is the fibrous portion rather than the particulate portion. Thus, when Dr. Gardner's research then documented the significance of counting fibers, the conspirators chose to suppress this information rather than inform the public health authorities and employees that existing standards and threshold limit values were established incorrectly and were in fact not providing adequate protection to the workers from exposure to harmful levels of asbestos dust.

143.

On November 12, 1948, Mr. Brown of Johns-Manville wrote to Manfred Bowditch, Field Director of Saranac Laboratory, reminding Mr. Bowditch of the 1936 agreement made by Dr. Gardner with the conspirators, pointing out the secrecy and prior approval provisions.

144.

On November 12, 1948, Mr. Brown also wrote to W.T. Kelly, Jr., Executive Vice President of American Brake Block, Division of the American Brake Shoe Company, and informed him that a meeting had been held to consider the Saranac Laboratory report on November 11, 1948, with all the "interested" parties represented except the Russell Manufacturing Company. Mr. Brown informed Mr. Kelly further that it was the unanimous opinion of the conspirators that all of Dr. Gardner's references in his work to cancer and tumors would be deleted prior to the revised version being published. Mr. Brown told Mr. Kelly that even though he had provided him a copy of the

Gardner/Vorwald report, that the reports were numbered and expected to be returned to him because the conspirators wanted no copies of Dr. Gardner's draft report circulating if Dr. Vorwald's version was to be different in any substantial respect.

145.

On December 6, 1948, Dr. Vorwald of Saranac Laboratory wrote to Dr. Lanza, who was now working part time as the Director of the New York University Institute of Industrial Medicine, in addition to his duties at Metropolitan Life. Dr. Vorwald informed Dr. Lanza that his job was to finish editing Dr. Gardner's work concerning the human asbestos material. He reassured Dr. Lanza that he understood that the 1936 Saranac agreement to submit articles for review by the conspirators before any publication.

146.

On December 14, 1948, Dr. Lanza, on behalf of Metropolitan Life and the other conspirators, wrote to Dr. Vorwald outlining the changes the conspirators required Dr. Vorwald to make in his draft of Dr. Gardner's work. Dr. Lanza told Dr. Vorwald that it was the consensus of the group that all references to cancers or tumors should be omitted, including any tables relating to the subject.

147.

On March 3, 1949, Mr. Brown of Johns-Manville wrote to Mr. Sabourin of the Quebec Asbestos Mining Association and forwarded to him a copy of the now "approved" Gardner/Vorwald report. Mr. Brown forwarded the report to Mr. Sabourin because of Mr. Sabourin's complicity and association with the other conspirators. Mr. Brown further suggested that Mr. Sabourin give a copy of their report to the Compensation Commission in Canada through the Ministry of Labor, in order to further the aims of the conspirators with officials in Canada. Mr. Brown warned Mr. Sabourin to otherwise keep the report in confidence until publication.

148.

On March 3, 1949, Mr. Brown also informed his fellow conspirators that he had received the Saranac final revised approved report and informed them that this report had adopted the substance of all the changes suggested by the conspirators. Mr. Brown further informed the

conspirators that he had arranged for publication of the report with an appropriate introduction to be made by Dr. Lanza.

149.

In January, 1951, the final version of the Saranac report was published in the AMA Archives of Industrial Hygiene and Occupational Medicine under the title "Experimental Effects of Asbestosis."   The published report wrongfully omitted Dr. Gardner's significant writings on human asbestosis and his critically important criticism of the asbestos dust threshold limit value and all mention of his animal studies on the positive relationship between asbestosis and cancer, and in keeping with the conspirators' original intent to mislead and deceive public health officials and the consuming public as set out above.  On June 11, 1951, Dr. K.W. Smith, Medical Director of Johns-Manville Corporation, informed his fellow officers of the corporation that the Saranac report had received a wide and adequate circulation. Dr. Vorwald had sent reprints to a wide circle of interested medical authorities, and Mr. Sabourin had sent the report to all members of the Quebec Asbestos Mining Association.  Dr. Smith further noted that the report was now in libraries of universities and medical schools across the United States.

150.

**WHEREFORE**, Petitioner demands of Defendants an amount that will fully and fairly compensate for all compensatory damages and for punitive damages to punish and deter Defendants and others similarly situated from like conduct in the future, for the costs of this action and for all other proper relief.

**PETITIONER FURTHER PRAYS** that Defendants be duly served and cited to appear and answer this petition and after all legal delays and due proceedings be had that there be judgment in favor of petitioner and against Defendants for all damages as are reasonable in the premises, together with legal interest thereon from date of judicial demand until paid and all costs of these proceedings.

**PETITIONER FURTHER PRAYS** for all general and equitable relief required or reasonable in the premises, and hereby request a trial by jury.

Respectfully submitted,
**GALANTE & BIVALACQUA, LLC**

_____
Scott M. Galante (#26890)
Stephanie M. Hartman (#38257)
650 Poydras Street, Suite 2615
New Orleans, Louisiana 70130
Telephone: (504) 648-1858
Facsimile:  (504) 561-0559

And

MOTLEY RICE LLC
Meredith Kay Clark (#37441)
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone:  (843) 216-9000
Fax:  (843) 216-9450

And

POURCIAU LAW FIRM
Damon R. Pourciau (#31529)
2000 Veterans Memorial Blvd., Suite 210
Kenner, Louisiana 70062
Telephone:  (504) 305-2375
Facsimile:  (504) 305-4168


**PLEASE SERVE:**

1) **ORIGINAL PETITION FOR DAMAGES;**
2) **MOTION AND INCORPORATED MEMORANDUM FOR EXPEDITED STATUS CONFERENCE AND EXPEDITED TRIAL SETTING;**
3) **ORDER FOR EXPEDITED STATUS CONFERENCE AND EXPEDITED TRIAL SETTING;**
4) **PETITION TO PERPETUATE TESTIMONY PURSUANT TO LA CODE OF CIV. PROC. ARTS. 1429, 1430, 1430.1 AND 1431; AND**
5) **EX PARTE ORDER PURSUANT TO LA CODE OF CIV. PROC. ART. 1430.1**


**ANCO INSULATIONS, INC.**
Through its agent for service of process:
Brent J. Bourgeois
Roedel, Parsons, Koch, Blache, Balhoff, & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, Louisiana 70809-7654

**A.W. CHESTERTON COMPANY**
Through its agent for service of process:
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**BAYER CROPSCIENCE, INC.**
Via the Louisiana Long-Arm Statute:
Corporation Service Company
80 State Street
Albany, New York 12207-2543

**BEXAR CANYON MANAGEMENT, INC.**
Through its agent for service of process:
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**BP PRODUCTS NORTH AMERICA, INC.**
Via the Louisiana Long-Arm Statute:
CT Corporation System
1999 Bryan Street, Suite 900
Dallas, TX 75201

**CBS CORPORATION**
Via the Louisiana Long-Arm Statute:
Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

**CERTAIN-TEED CORPORATION**
Through its agent for service of process:
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**CHAS. KURZ & CO., INC.**
Via the Louisiana Long-Arm Statute:
One Bala Plaza East, Suite 600
Bala Cynwyd, Pennsylvania 19004-1496

**CHARLES JOHNSON**
Via the Louisiana Long-Arm Statute:
436 Raleigh Court
Waynesboro, Virginia 22980

**CHEVRON U.S.A. INC.**
Through its agent for service of process:
The Prentice-Hall Corporation System, Inc.
501 Louisiana Avenue
Baton Rouge, Louisiana 70802

**CHIQUITA BRANDS INTERNATIONAL, INC.**
Through its agent for service of process:
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, Louisiana 70816

**CRANE CO.**
Via the Louisiana Long-Arm Statute:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

**CRESCENT MATERIALS SERVICE, INC.**
Through its agent for service of process:
Elizabeth F. Pretus Ebarb
10016 Idlewood Place
River Ridge, Louisiana 70123

**CSR, LIMITED**
Via the Louisiana Long-Arm Statute:
T9 Help Street
Chatswood, NSW 2057
Australia

**CSR, LTD.**
A foreign corporation that can be served through Louisiana Counsel:
Frank Accardo, Esq.,
1100 Poydras Street,
3200 Energy Centre
New Orleans, LA 70163-1132;

**CSR, LTD.**
A foreign corporation that may be served through counsel of record in California
pursuant to the Louisiana Long Arm Statute:
Michel Futterman, Esq.,
Futterman & Dupree, LLP,
160 Sansome Street,
17th Floor
San Francisco, California 94104

**CSR, LTD.**
A foreign corporation that may be served pursuant to the Louisiana Long Ann Statute:
CSR Limited,
9 Help Street,
Chatswood, New South Whales,
Australia 2067.

**FARRELL LINES**
Via the Louisiana Long-Arm Statute:
2510 Walmer Avenue, Suite C
Norfolk, Virginia 23513-2601

**FMC CORPORATION**
Through its agent for service of process:
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**FOSTER WHEELER CORPORATION**
Via the Louisiana Long-Arm Statute:
United States Corporation Company
2711 Centerville Road, Suite 400
Wilmington, Delaware 19808

**GENERAL ELECTRIC COMPANY**
Through its agent for service of process:
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**GOULDS PUMPS, LLC**
Through its agent for service of process:
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**GREFCO, INC.**
Through its agent for service of process:
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, Louisiana  70802

**HOPEMAN BROTHERS, INC.**
Via the Louisiana Long-Arm Statute:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

**HUNTINGTON INGALLS INCORPORATED**
Through its agent for service of process:
C.T. Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**IDEX CORPORATION**
Via the Louisiana Long-Arm Statute:
C.T. Corporation System
208 South LaSalle Street, Suite 814
Chicago, Illinois 60604

**INGERSOLL-RAND COMPANY**
Through its agent for service of process:
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, Louisiana 70802

**INTERNATIONAL PAPER COMPANY**
Through its agent for service of process:
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**ISBRANDTSEN COMPANY, INC.**
Via the Louisiana Long-Arm Statute:
26 Broadway
New York, New York 10004

**JOHN CRANE, INC.**
Through its agent for service of process:
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**LGS TECHNOLOGIES**
Via the Louisiana Long-Arm Statute:
2950 W. Wintergreen
Lancaster, TX 75134

**LIBERTY MUTUAL GROUP, INC.**
Through the Louisiana Secretary of State
3851 Essen Lane
Baton Rouge, Louisiana 70809

**MARYLAND CASUALTY COMPANY**
Through the Louisiana Secretary of State
3851 Essen Lane
Baton Rouge, Louisiana 70809

**METROPOLITAN LIFE INSURANCE COMPANY**
Through the Louisiana Secretary of State
3851 Essen Lane
Baton Rouge, Louisiana 70809

**NATIONAL BULK CARRIERS, INC.**
Via the Louisiana Long-Arm Statute:
Eight Points Asset Management
445 Park Avenue, Suite 1503
New York, New York 10022

**OWENS-ILLINOIS, INC.**
Via the Louisiana Long-Arm Statute:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

**TAYLOR-SEIDENBACH, INC.**
Through its agent for service of process:
Robert I. Shepard
731 South Scott Street
New Orleans, Louisiana 70119

**TEXACO, INC.**
Via the Louisiana Long-Arm Statute:
6001 Bollinger Canyon Road
San Ramon, California 94583-2324

**THE McCARTY CORPORATION**
Through its agent for service of process:
Paul Spaht
4232 Bluebonnet Blvd.
Baton Rouge, Louisiana 70809

**TRIPLEX, INC.**
Via the Louisiana Long-Arm Statute:
Denise Rodriguez
1122 Kress
Houston, TX 77020

**UNION CARBIDE CORPORATION**
Through its agent for service of process:
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

**WARREN PUMPS, LLC**
Via the Louisiana Long-Arm Statute:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

**WEIR VALVES & CONTROLS USA, INC.**
Via the Louisiana Long-Arm Statute:
CT Corporation System
155 Federal Street, Suite 700
Boston, Massachusetts 02110